UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14-cv-00122-FDW
(3:07-cr-00166-FDW-1)

MICHAL ZAKRZEWSKI,                    )
                                      )
            Petitioner,               )
                                      )
      v.                              )          **O R D E R**
                                      )
UNITED STATES OF AMERICA,             )
                                      )
            Respondent.               )
_____       )

**THIS MATTER** is before the Court on consideration of Respondent's Motion to Vacate,

Set Aside or Correct sentence which he filed pro se pursuant to 28 U.S.C. § 2255. The

Government has filed a response opposing any relief, and Petitioner has filed a reply. Having

considered the record in this matter, the parties' respective positions, and the controlling law, the

Court finds that Petitioner has failed to state a claim for relief and his § 2255 Motion to Vacate

will be dismissed with prejudice.

BACKGROUND

On August 12, 2009, Petitioner entered into a written plea agreement with Respondent,

agreeing to plead guilty to two counts in a twenty-three count bill of indictment. Specifically,

Petitioner agreed to plead guilty to a charge of conspiracy to defraud the United States, in

violation of 18 U.S.C. §§ 371 & 2326 (Count 1), and one count of wire fraud and aiding and

abetting the same, in violation of 18 U.S.C. §§ 1343, 2 & 2326 (Count 8). In exchange for

Petitioner's guilty plea, Respondent agreed to dismiss the remaining twenty-one wire fraud

charges that were filed against him.

On the same day the plea agreement was filed, Petitioner's Plea and Rule 11 hearing commenced before U.S. Magistrate Judge David S. Cayer and Petitioner was placed under oath. Respondent summarized the elements of Counts 1 and 8, and the potential penalties and fines he faced up conviction, and Petitioner averred that he understood the attendant consequences of pleading guilty. The court explained that Petitioner could plead not guilty, and contest the charges at trial where Respondent would be required to prove each of the elements of Count 1 and 8 beyond a reasonable doubt. Petitioner admitted he understood those rights, but that he had decided to plead guilty because he was in fact guilty of the charged conduct. Petitioner averred that he understood that by entering into the plea agreement and pleading guilty that he would waive, among other things, his right to contest his sentence on appeal or collateral review, except on grounds of ineffective assistance of counsel or prosecutorial misconduct. Petitioner averred that he understood he was waiving these rights, and he agreed that he understood and agreed with each of the other terms of the plea agreement.

Petitioner next averred that no one had threatened, intimidated or induced him to enter into the plea agreement, and that no one had promised him any leniency in exchange for his plea, other than those promises contained in the plea agreement. Finally, Petitioner stated that he had sufficient time to discuss possible defenses to the conduct charged in Counts 1 and 8 with his counsel, and that he was satisfied with the services of his attorney. After finding that Petitioner's counsel was satisfied that he understood the terms of the plea agreement and the Rule 11 proceedings, the court presented the plea transcript to Petitioner and he signed the transcript, thereby averring that he understood and agreed with all parts of the plea hearing and the answers he had given. The court then concluded the plea was knowing and voluntary and it was therefore accepted and recorded.

Following the entry of Petitioner's guilty plea, the U.S. Probation Office prepared a presentence investigation report (PSR). In calculating the Guidelines range, the probation officer included a thorough description of the offense conduct involved in the conspiracy which is as follows:

8. **Michal Zakrzewski**, along with more than four dozen co-conspirators, participated in a sweepstakes fraud that primarily victimized elderly U.S. citizens. The conspirators ran their telemarketing scheme from the San Jose, Costa Rica area. The scheme was brought to Costa Rica by conspirators who had lived in Canada. The conspirators included U.S., Canadian, and Costa Rican nationals. Victims of this scheme were routinely instructed to send insurance fees for sweepstakes prize money to Costa Rica, or Antigua and Barbuda, via Western Union wire transfers. Western Union representatives have confirmed that all Western Union wire transfers are electronically routed and processed in and through Charlotte, NC, prior to being sent to their ultimate destinations.

9. The sweepstakes scheme commenced with a telephone call to a potential victim, or "lead." The "opener" (an employee at a call center who has the initial contact with a victim) informed the victim that he won second prize in a lottery. The initial "prize" typically ranged from $350,000 to $450,000. The victim was asked to send several thousand dollars (allegedly to be refunded) via Western Union to "Lloyds of London of Costa Rica" to insure safe delivery of the money. Investigating agents later confirmed that Lloyds of London does not have a Costa Rican office, nor does it insure these types of transactions. The caller told the victim that the insurance was necessary due to the security required since "9/11," as well as a host of other bogus reasons. The telemarketers usually represented themselves as federal agents of a non-existent agency, such as the "United States Sweepstakes Security Commission" or the "United States Sweepstakes Security Bureau," both a fictional branch of the Department of Commerce that was allegedly "established during the Reagan Administration to regulate sweepstakes." Victims who demanded proof in writing were faxed a fake history of the Sweepstakes Commission complete with a history of how the commission assisted federal law enforcement in halting phony sweepstakes offers. The faxed document contained an authentic seal of the Bureau of Industry and Security of the Department of Commerce, and a false Washington, D.C. mailing address.

10. Since the calls to victims were initiated in Costa Rica, anyone making the calls to victims understood the assertions made to the victims were false. For example, a typical pitch sheet used by telemarketers, provided the following script:

My name is _____ . I am calling from the Sweepstakes Security Commission in Washington, DC. We are a non-profit consumer protection agency, established by the government to

3

monitor and control all activities of the sweepstakes and lotteries; and of course to assist recipients of awards.

If a victim agreed to send money, but failed to do so, a conspirator would call the victim and make the following false representations to the victim:

> What do you mean? You remember you gave me your verbal authorization on a recorded conversation with your Federal Government to secure that policy with Lloyd's.
> One, if you didn't take care of that, Lloyd's has nothing to assume other than you were expecting to receive the check without a policy on it. That would be insurance fraud, a serious crime. Luckily, the Sweepstakes Security Commission would not let the check be delivered under such circumstances. Failure to take care of your obligation therefore is called "intent to commit insurance fraud," a misdemeanor.
> Two, remember that I am a Federal Agent and your agreement was recorded. You understand that there are laws in place for reasons of national security that prevent citizens from deceiving government employees of my rank. I know you are not a terrorist but we must still apply the law. This crime is called "defrauding a Federal Agent." It is a Federal misdemeanor.

11. Investigators also obtained a copy of a reminder posted in one call center that was operating the fraudulent sweepstakes scheme. The reminder stated: "IF YOU HAVE THE SLIGHTEST SUSPICION THAT YOU ARE SPEAKING WITH SOMEONE SLIGHTLY INTELLIGENT, BEING RECORDED, ON A THREE WAY CALL, BEING TRACED, SPEAKING WITH LAW ENFORCEMENT OF ANY KIND, AND SO ON, DO NOT EVEN ATTEMPT TO USE IT!! THIS COULD KILL AN OFFICE."

12. As part of this investigation, agents tracked several telephone numbers that were used by the conspirators to conduct the sweepstakes fraud and found these numbers were assigned to Vonage, a New Jersey based telecommunication company. These numbers were used via a Voice over Internet Protocol service (VoIP) to telephone the victims of this fraud from San Jose, Costa Rica. VoIP technology, which utilizes a computer to make telephone calls over the Internet, allowed a user to disguise his calling location, making it appear the call originated from another area code. Often participants in the scheme had their VoIP system programmed to display a "202" Washington, D.C. area code number on the victim's caller ID system; thereby reinforcing a victim's belief that the caller was actually located in Washington, D.C. and the sweepstakes was associated with the federal government. The VoIP technology allowed conspirators to persuade victims that the sweepstakes scheme was

real. Using the VoIP technology in this manner legitimized the conspirator's claims that sweepstakes money was available and protected by the U.S. Government.

13. Vonage provided investigators with subscriber records identifying the owner of telephone numbers that were being used to perpetrate the sweepstakes scheme. With this information, agents were able to locate and identify the subscriber, who ultimately identified locations where he delivered and installed Vonage equipment, and identified co-conspirators.

14. Once a victim was induced into sending money for the purported insurance fees for second place prize winnings, a conspirator would again call or "load" the victim. A "loader" was a call center employee who took over contact with a victim after the victim made an initial payment as a result of an opener's pitch. This time the telemarketer falsely represented that a mistake had been made and that the victim had actually won first prize (typically over $3 million U.S. dollars), adding that due to the increased amount of the prize, the victim must wire additional money for the purported "insurance fee" and/or "taxes" through Western Union. The conspirators continued to "load" victims as long as the victims continued to wire money, resulting in many victims repeatedly wiring money to conspirators without ever receiving the promised prize money. This type of tactic was also called a "reload."

15. Evidence indicates more than 15 call centers operated the fraudulent sweepstakes scheme in the San Jose area. Call centers were also referred to as "boiler rooms." Agents assert here were many more call centers, but since call centers were frequently shut down and relocated by conspirators, the exact number of call centers was difficult to determine.

16. A law enforcement raid and search took place in Costa Rica on May 16, 2006. This raid involved 150 OIJ agents (*Organismo de Investigacion Judicial -* Organization of Judicial Investigation - the Costa Rican Equivalent of the FBI), along with about 15 U.S. agents as observers. More than 15 call centers and residences were raided and a massive amount of evidence was seized. In addition, on this same day, five more arrests and searches took place in the United States.

17. Based upon numerous interviews with the identified victims and a review of consumer complaint databases in the United States, agents estimate that victim losses attributable to this fraudulent sweepstakes scheme exceeded $15 million in U.S. currency. Based on rough estimates, the United States believes that the conspirators included in U.S. vs. Giuseppe
Pileggi collected about $10,000,000, while the conspirators included in U.S. vs. Charles Robert Cummins collected about $5,000,000. Agents assert it is extremely difficult to ascertain loss amounts because victims were embarrassed about being fooled and hesitated to admit any involvement in a fraudulent scheme. Victims were also hesitant to believe that investigating agents truly were federal agents having been tricked by telemarketers who falsely represented their status as federal agents in the sweepstakes scheme.

18. **Michal Zakrzewski** met co-conspirator Giuseppe Pileggi during 2000, while living in Canada. While in Canada, he worked for Pileggi in various capacities, including as a telemarketer promoting a similar sweepstakes scheme as later perpetrated in Costa Rica. **Zakrzewski** indicated he retained approximately 30% of any monies sent by victims. **Zakrzewski** stated that he, Pileggi, and co-conspirator Herman Kankrini started the telemarketing fraud calls in Canada around 2001, and continued this scheme until around February 2002. During April 2002, **Zakrzewski** borrowed money from Kankrini and traveled to Costa Rica where he, Kankrini, Pileggi, and others continued to perpetrate and refine the sweepstakes fraud.

19. After relocating to Costa Rica, **Zakrzewski** worked as an opener for Pileggi at a call center. He recalled that some of the scripts included text that suggested the telemarketer was affiliated with a non-profit organization established by the U.S. government. **Zakrzewski** acknowledged he was not particularly successful because of his heavy Polish accent. He estimated he earned about $6,000 or $7,000 during 2002.

20. During 2002, **Zakrzewski** met co-conspirator Michael Mangarella. Mangarella and Pileggi opened a call center together in late 2002, which employed nine or ten employees, including **Zakrzewski**. **Zakrzewski** estimated he made an average of $1,500 per month while working at this call center.

21. During the fall of 2003, **Zakrzewski** went to work for Pileggi at a new call center where **Zakrzewski** became a "room boss." This call center was located in the Barrio Mexico section of San Jose and was large enough to require two room managers, one for each floor. The two room managers, **Zakrzewski** and co-conspirator Ray Bingham, earned a percentage of the center's weekly profits. **Zakrzewski** and Bingham hand delivered the names of victims who required a "load" or "reload" to either Kankrini or Pileggi. At some point, Bingham told Pileggi that **Zakrzewski** was stealing from the call center. This led to **Zakrzewski** leaving the Pileggi center and finding work at another call center managed by co-conspirator Al Duncan. **Zakrzewski** stated Duncan's call center was better organized and the employees worked longer hours. When **Zakrzewski** quit working for Duncan after several months, he took scripts and rebuttal sheets with him.

22. During early 2005, **Zakrzewski** went back to work for Pileggi, bringing with him the scripts and rebuttal sheets he had taken from the Duncan call center. **Zakrzewski** stated it was at this call center that he first dealt with co-conspirator Trent Nyffeler (Tula), who was a lead list provider from Texas. **Zakrzewski** stated that while working as a room boss at this call center, he made approximately $70,000 - $80,000 over a seven to eight month period (50% of the proceeds generated by the call center). Sometime during May 2005, **Zakrzewski** had an encounter with Duncan, who had found out **Zakrzewski** was

using the name of "Duncan" or "Al Duncan" when contacting victims. Reports indicate Duncan used a gun to threaten **Zakrzewski.**

23. **Zakrzewski** acknowledged that while working the sweepstakes scheme, he could estimate a victim's age based on the sound of their voice, or from examining the handwritten scripts. **Zakrzewski** stated he had better results with younger victims, which he surmised was due to his heavy accent and elderly people's inability to understand him.

24. **Zakrzewski** left Pileggi's call center around December 2005. He stated he had approximately $40,000 in savings, which he used to open a small scooter rental business in Puerto Viejo, Costa Rica. From July 2006, to his arrest on June 25, 2007, **Zakrzewski** stated he worked as a tourist guide for resort areas in Costa Rica.

25. The Indictment lists numerous overt acts involving telephone calls made to victims between September 2, 2005, and December 7, 2005. The Indictment also lists overt acts where the defendant and other co-conspirators received telephone calls from miscellaneous victims between August 20, 2005, and December 10, 2004. Finally, the Indictment lists 22 overt acts where the defendant and other co-conspirators caused and received Western Union wire transfers between August 30, 2005, and December 16, 2005. Count Eight of the Indictment notes specifically that on October 11, 2005, the defendant committed wire fraud involving a victim located in Detroit Lakes, MN, and a transmittal totaling $1,789.

26. Both parties agree the amount of loss reasonably foreseeable by **Zakrzewski** was more than $400,000, but less than $1,000,000.[1]

The probation officer applied the same Guidelines upon which the parties agreed

in the plea agreement, to wit:

34. **Base Offense Level:** The United States Sentencing Commission Guideline for violation of 18 U.S.C. § 371 is found in USSG §2B1.1(a)(1) and calls for a base offense level of 7.

35. **Specific Offense Characteristic:** Both parties stipulated that the loss amount reasonably foreseeable to the defendant was more than $400,000, but less than $1,000,000. Pursuant to USSG §2B1.1(b)(1)(H), 14 levels are added.

36. **Specific Offense Characteristic:** The offense involved more than 250 victims. Pursuant to USSG §2B1.1(b)(2)(C), 6 levels are added.

---

[1] The parties stipulated during sentencing that the offense conduct in the PSR provided a factual basis for entry of the guilty plea and they agreed the Court could rely on this conduct in making such a determination. (3:07-cr-00166, Doc. No. 31: Sentencing Tr. at 6).

37. **Specific Offense Characteristic:** The offense involved a misrepresentation that the defendant, and others, were acting on behalf of a government agency. Pursuant to USSG §2B1.1(b)(8)(A), 2 levels are added.

38. **Specific Offense Characteristic:** A substantial part of the sweepstakes schemes was committed from outside the United States. Pursuant to USSG §2B1.1(b)(9)(B), 2 levels are added.

39. **Victim-Related Adjustments:** The majority of the victims of this offense were elderly. Since the defendant knew, or should have known, the victims of the conspiracy and scheme to defraud were unusually vulnerable due to age, physical or mental condition, or that they were otherwise particularly susceptible to the criminal conduct, a 2-level increase is appropriate. USSG §3A1.1(b)(1). Pursuant to USSG §3A1.1(b), the offense level is increased 2 levels.

40. **Adjustments for Role in the Offense:** The defendant was a room boss at more than one call center. Pursuant to USSG §3B1.1(b), the offense level is increased 3 levels.

41. **Adjustment for Obstruction:** None.

42. **Adjusted Offense Level (Subtotal): 36**

43. **Chapter Four Enhancements:** None.

44. **Adjustment for Acceptance of Responsibility:** Pursuant to USSG §3E1.1(a) and (b), the offense level is reduced 3 levels provided the government makes a formal motion at the time of sentencing.

45. **Total Offense Level: 33**

(Id., PSR ¶¶ 34-45) (bold in PSR).[2]

In considering Petitioner's statutory sentencing range, the probation officer noted a term of not more than 15 years on Count 1, and not more than 30 years on Count 8. Based on Petitioner's Level I criminal history category and a total offense level of 33, the probation officer calculated a Guidelines range of 135-168-months' imprisonment, although the plea agreement provided that Petitioner remained free to argue for a variance or departure from this range.

---

[2] All of the citations are to the page numbers located at the bottom footer of the ECF document.

On September 22, 2009, Petitioner appeared for his sentencing hearing and at the outset the Court confirmed that he understood the Rule 11 proceedings wherein he entered his guilty plea. In particular, he acknowledged he was under oath during the hearing and had truthfully answered each of the magistrate judge's questions, and that he would answer each those questions in the same way if the Court chose to pose them again during sentencing. Petitioner affirmed that he had reviewed the acceptance of plea form and signed it because he agreed that each of the answers he had provided were true. Petitioner also reaffirmed that he was in fact guilty of the felony conduct charged in Counts 1 and 8. After concluding the Rule 11 hearing was properly conducted, Petitioner's guilty plea was affirmed and based on the parties' stipulation to the offense conduct detailed above in the PSR, the Court found there was a factual basis for the plea and it was accepted.

The Court next turned to the final presentence report. Petitioner acknowledged that he had read the report and understood its contents, and that he had reviewed its contents with his counsel. Although Petitioner filed a number of objections to the PSR, the parties agreed that none of the objections, even if sustained, would have any impact on the calculation of Petitioner's Guidelines range. (3:07-cr-00166, Doc. No: 31: Sentencing Tr. 7).

In addressing Petitioner's potential sentence, his counsel, who filed a thorough and detailed sentencing memorandum, discussed important aspects of the memorandum and argued for a variance based on factors related to Petitioner's participation in the conspiracy, particularly his decision to withdraw from the conspiracy before many of his co-defendants. Counsel also urged that a variance was appropriate because he had shown that he was willing to cooperate and testify to further the prosecution's efforts.

Petitioner allocated to the Court and expressed remorse for his participation in the fraud conspiracy and noted that he walked away early because he felt ashamed that he actively worked to defraud people through the scheme. Petitioner also noted that he would still be willing to cooperate with the Government in an effort to aid its prosecution and possibly earn a lower sentence.

The Government adopted a far different view which, in general, relied upon facts that supported a finding that Petitioner played a substantial role in the conspiracy and had, in fact, been an active participant for years before he decided to withdraw. The Government also noted that, despite Petitioner's position to the contrary, his delay in being arrested, and therefore in not being able to cooperate, was based on his own actions in leaving the conspiracy and the area. In other words, the evidence gathered in debriefings after his arrest show that Petitioner knew the fraud scheme was being dismantled; therefore he could have turned himself in if he was so eager to assist the prosecution, and thereby potentially aid his own cause. He did not, however, and it was only following his arrest that he expressed a willingness to cooperate.

After hearing from the parties, the Court thoroughly considered the evidence in this matter and applied the same to the § 3553(a) factors, and found that a within-Guidelines sentence was appropriate and imposed a sentence of 126-months' imprisonment, a 3-year term of supervised release, and an order of restitution in the amount of $4,291,473.00, to be paid jointly and severally with his co-defendants. (Id., Doc. No. 29: Judgment; Doc. No. 30: Statement of Reasons).

On appeal from this judgment, Petitioner challenged his sentence, including the restitution order. After considering the parties' arguments, the Court found that Petitioner's challenge to his sentence was foreclosed by his appeal waiver in his plea agreement; however the

Court noted the restitution order was in excess of the statutory maximum. The judgment as it pertained to the order of restitution was vacated and remanded to this Court for further proceedings. See United States v. Zakrzewski, 462 F. App'x 421 (4th Cir.), cert. denied, 132 S. Ct. 2755 (2012). On remand, the Court entered an order reducing the restitution amount to $1,969,659.67, and he did not appeal. (Id., Doc. No. 52: Amended Judgment).

In this collateral proceeding, Petitioner raises a number of interrelated claims of ineffective assistance of counsel, prosecutorial misconduct and challenges to rulings of this Court that will be examined in turn below.

STANDARD OF REVIEW

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief. The Court has considered the record in this matter and applicable authority and concludes that this matter can be resolved without an evidentiary hearing. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

DISCUSSION

A.      Ineffective assistance of counsel

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the effective assistance of counsel to assist in his defense. U.S. Const. amend. VI. In order to prevail on a claim of ineffective assistance of counsel, a petitioner must show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) the deficient performance was prejudicial to the defense. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In measuring counsel's performance,

there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . ." Id. at 689. A petitioner seeking post-conviction relief based on ineffective assistance bears a "heavy burden in overcoming this presumption." Carpenter v. United States, 720 F.2d 546, 548 (8th Cir. 1983). Conclusory allegations do not overcome the presumption of competency. Id.

To demonstrate prejudice in the context of a guilty plea, a petitioner must demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). Petitioner "bears the burden of proving Strickland prejudice." Fields v. Attorney Gen. of Md., 956 F.2d 1290, 1297 (4th Cir. 1992) (citing Hutchins v. Garrison, 724 F.2d 1425, 1430-31 (4th Cir. 1983), cert. denied, 464 U.S. 1065 (1984)). If petitioner fails to meet this burden, "a reviewing court need not consider the performance prong." Fields, 956 F.2d at 1297 (citing Strickland, 466 U.S. at 697).

In considering the prejudice prong of the analysis, the Court must not grant relief solely because petitioner can show that, but for counsel's performance, the outcome of the proceeding would have been different. See Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998). Rather, the Court "can only grant relief under the second prong of Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Id. (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).

### 1. Ground One (A)

Petitioner first maintaines his counsel enticed him into agreeing to participate in the proffer sessions and that counsel failed to secure the Government's promise of a particular plea agreement. (3:14-cv-00122, Doc. No. 1-1: Petitioner's Mem. 16).

After Petitioner was indicted on July 25, 2007, he was brought before U.S. Magistrate

Judge David Keesler for his arraignment. Petitioner requested appointed counsel due to his

indigent status and Judge Keesler granted the request and appointed James McLoughlin, who

served as his counsel during the course of the criminal proceedings. On August 12, 2009,

Petitioner pleaded guilty pursuant to a written plea agreement. It appears that sometime between

the arraignment and the filing of the plea agreement, Petitioner entered into a "PROFFER

AGREEMENT" with the Fraud Section, Criminal Division of the U.S. Department of Justice and

with agents of federal law enforcement. (Id., at 35: Proffer Agreement).[3]

Petitioner notes there were many co-conspirators that had entered into plea agreements

and were sentenced to terms of imprisonment that were far lower than his because they had

provided assistance to the Government, and that he could not provide such assistance because he

was still detained in Costa Rica. Petitioner maintains counsel was aware of this, but he

nonetheless "insisted on the proffer." (Petitioner's Mem. 10). Petitioner also contends counsel

informed him prior to the proffer meeting that he had spoken with the Government and he would

likely be offered a plea agreement that include a term of 41 months, even if he was unable to

provide valuable assistance to the Government, but if he did provide useful information, his

sentence would be lower because he would receive the benefit of a § 5K.1.1 reduction. (Id., at

10-11).

Petitioner's arguments here are merely unadorned efforts to attack the knowing and

voluntary nature of his decision to plead guilty and they will be dismissed because, as this Court

has repeatedly found, Petitioner's guilty plea was knowing and voluntary as a matter of law.

---

[3] Although the exhibit Petitioner attached to his memorandum is not signed, there appears to be no issue that the parties did agree to be bound by the Proffer Agreement.

During his Rule 11 hearing Petitioner was placed under oath and asked the following questions:

> THE COURT: Has anyone threatened, intimidated or forced you into pleading guilty today?
>
> THE DEFENDANT: No.
>
> THE COURT: Other than the terms of your plea agreement, has anyone made you any promises of leniency or a light sentence to induce you to plead guilty?
>
> THE DEFENDANT: No.

(3:07-cr-00166, Doc. No. 34: Tr. of Plea Hr'g 11; Doc. No. 20: Acceptance and Entry of Plea ¶¶ 27-28).

It is well-settled that a petitioner is bound by his sworn statements that he makes during a properly conducted Rule 11 hearing and as this Court found during sentencing, and reaffirms herein, Petitioner's Rule 11 hearing was properly conducted therefore his present challenges to his guilty plea must fail. See, e.g., Blackledge v. Allison, 431 U.S. 63, 73-74 (1977) ("For the representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity."); United States v. Lemaster, 403 F.3d 216, 221 (4th Cir. 2005).

Last, as to Petitioner's contention that his counsel was ineffective in failing to secure the Government's phantom promise of a specific plea agreement, the Court finds it is without merit, for as the Government notes, no such offer ever existed. (3:14-cv-00122, Doc. No. 5: Government's Response). To the extent Petitioner's counsel and the Government may have brainstormed potential sentences, it is black letter law that the Government is under no obligation

to offer a plea agreement. See Missouri v. Frye, 132 S. Ct. 1399, 1410 (2012) (internal citation omitted).[4] Because this argument is hopeful at best, and not based on the record, it will be dismissed.

### 2. Ground One (B)

Petitioner next contends that his counsel was ineffective because he failed to discuss the plea agreement with him. This argument is plainly belied by the record as it is clear from the Rule 11 hearing that Petitioner had reviewed the terms of the plea agreement with him. However, even assuming arguendo that his counsel did not, the Government summarized the terms of the agreement during the hearing, and Petitioner averred that he understood and agreed with each of the terms of the plea agreement. (Tr. of Rule 11 Hr'g, supra; Acceptance and Entry of Plea, supra ¶ 23). Moreover, Petitioner's counsel represented to the court that he had reviewed of the terms of the plea agreement with Petitioner, and that he was satisfied that Petitioner understood those terms. (Tr. of Rule Hr'g supra, at 14; Acceptance and Entry of Plea, supra ¶ 34). Petitioner's argument that his plea was effected by this alleged counsel error is meritless and it will be denied.

### 3. Ground One (C)

Petitioner contends his counsel failed to object to his Guidelines calculations. (Motion to Vacate 4; Petitioner's Mem. 12). In particular, Petitioner contends he urged his counsel to object to a two-level increase in his Guideline range because his offense of conviction lacked sufficient evidence that he and others misrepresented themselves by informing the victims that they were acting on behalf of a government agency. See USSG § 2B1.1(b)(8)(A) (2008).

---

[4] Of course the Government did offer a written plea agreement which Petitioner accepted, but there were certainly no mention in this agreement regarding the lowball sentence Petitioner believed was forthcoming.

This argument without merit as Count 1 of the bill of indictment expressly charges Petitioner and others with misrepresenting that they were "a governmental agency charged with ensuring that sweepstakes winners received their money." (3:07-cr-00166, Doc. No. 7: Bill of Indictment ¶ 11; PSR ¶¶ 9-10) (noting telemarketers routinely represented themselves as federal agents or other agents of other bogus departments that were under the U.S. Dept. of Commerce). In addition, as the Court has repeatedly observed, Petitioner agreed under oath that he was in fact guilty of the conduct charged in Count 1. Accordingly, his counsel was not ineffective in declining to present a meritless objection.

Petitioner also contends that his counsel was ineffective when he did not challenge the vulnerable victim enhancement under USSG § 3A1.1(b)(1), which is applied when the evidence shows the victims of the conspiracy and scheme to defraud were unusually vulnerable, whether due to age, physical or mental condition, or they were otherwise susceptible to be taken in by criminal conduct.

Here, the evidence in the PSR, to which Petitioner did not object, demonstrated that a predominate number of the victims of the conspiracy to defraud were elderly U.S. citizens, and many of them were reluctant to admit they were defrauded because they were embarrassed about being fooled and some were even hesitant to admit they were involved in any fraudulent scheme at all. This argument is overruled.

4.      Ground One (D)

Petitioner raises yet another challenge to his guilty plea, this time through a claim that counsel coerced him into signing the plea agreement. For the reasons already previously stated, this claim will be denied.

5.      Ground One (E)

Petitioner contends he is entitled to collateral relief because his counsel failed to honor his promise to attend Petitioner's interview with the probation officer who was then preparing the presentence report. Petitioner maintains the probation officer only spent around ten minutes with him and the officer failed to ask enough pertinent questions about his involvement in the conspiracy. Petitioner also complains that the officer produced a draft PSR with factually inaccurate information regarding his involvement in the conspiracy. (Petitioner's Mem. 14-15). First, there is no constitutional right to have counsel in attendance during a presentence interview. Second, Petitioner had an opportunity to file objections to alleged factual errors. In sum, this argument is plainly conclusory and fails to demonstrate what prejudice or deficient performance.

Second, Petitioner argues the PSR should not have included statements he made during his proffer sessions. This argument will be overruled for the simple reason that it was Petitioner volunteering the statements. The Proffer Agreement merely restricts the information the Government may offer, not the statements Petitioner chooses to volunteer.

Finally, Petitioner complains he only received a copy of his PSR by mail one day before sentencing and that counsel failed to include the objections he wished to present. This argument will be denied because Petitioner confirmed during sentencing that he had reviewed the PSR and understood its content, and he that had he reviewed the PSR with his attorney. Further, Petitioner's proposed objections, as previously observed, were meritless. Finally, Petitioner's claim that he was unable to see the witness statements appears to be untrue at best, in light of the foregoing, but in any event he could have requested the opportunity to do so during sentencing.

6. Ground One (F)

Petitioner argues here that his counsel failed to present and discuss sentencing issues with him. (Petitioner's Mem. 15). This argument is nothing short of a blanket objection and is not supported by the record, first because Petitioner acknowledged before this Court that he had reviewed and understood the contents of the PSR and he reviewed the PSR with his attorney. And at no time during sentencing did Petitioner protest the proposed enhancements (which would have been futile in any event).

Second, Petitioner's contention that he did not receive a copy of the Sentencing Memorandum does not demonstrate prejudice because Petitioner could have requested time to review the document during his sentencing hearing; yet he failed to do so even while Petitioner exercised his right to address the Court during his allocution

Petitioner offers no credible argument that but for counsel's alleged errors in presenting certain objections or information to the Court that he would have pleaded not guilty and proceeded to trial. This claim will be denied as conclusory and without merit.

7. Ground One (G)

Petitioner principally complains that the Government impermissibly introduced statements he made in the proffer meeting during sentencing, and these statements convinced this Court to impose a harsher sentence. In fact, Petitioner contends the use of these prohibited statements "was probably the major factor that caused Zakrzewski to receive the longest sentence among all co-defendants who plead [sic] guilty in this case." (Petitioner's Mem. 17). In sum, Petitioner argues counsel should have objected to the introduction of these statements during sentencing.

The statements the Government offered that are at issue are (1) that he knew about the 2006 raids and arrests; (2) that he located an monitored a website (the website maintained by this District) containing information about the arrests; (3) "that he withdraw [sic] from the conspiracy with about $40,000 . . . (this information, the Government also passed on to the PSR, thus breaching the agreement)"; and (4) that he lived in a beach town where he operated his own scooter rental business. (Id., at 20-21). According to Petitioner, these statements had the combined impact of defaming him during sentencing and derailed his chances of receiving a downward variance. (3:07-cr-00166, Doc. No. 25: Sealed Sentencing Memorandum).

Petitioner's contentions are with merit. As the Government notes in its response in opposition, proffer agreements are contracts and each proffer agreement must be enforced according its contractual terms. (Id., Doc. 5: Government Response 21) (citing United States v. Cobblah, 118 F.3d 549, 551 (7th Cir. 1997)). When examining proffer agreements, the Fourth Circuit observed that "Section 1B1.8 of the Sentencing Guidelines provides:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

U.S.S.G. § 1B.1(8)(a)."

Petitioner's Proffer Agreement provides, in pertinent part, that the Government was prohibited from offering statements made by Petitioner during the proffer meeting against him, unless the Government uses the statements "to rebut any evidence offered by or on my behalf in connection with the trial and/or sentencing . . ." (Proffer Agreement ¶ 4).

In support of a downward variance from his Guidelines range, Petitioner argued he was so entitled because he withdrew from the conspiracy while it was in full swing, and because he

later lived in a beach town where he operated a scooter business that conducted tours of Costa Rica and was funded with his own money. (Sealed Sentencing Memorandum 5).

The Government did not violate the terms of the Proffer Agreement because the statements Petitioner made during his proffer session that pertained to reasons for a variance were properly fodder for rebuttal. In other words, the fact that Petitioner admitted he opened and operated the scooter business with $40,000 that he stole from the fraud conspiracy demonstrated he was still benefitting from the conspiracy (even after he left it) and therefore he was hardly blameless. Accordingly, the Government was not precluded from noting that the business was started and operated with money stolen from the victims in an effort to rebut his plea for leniency.

Petitioner also argued that a variance was appropriate because he would have cooperated with the Government during its investigation into the fraud conspiracy, both prior to and after his arrest and conviction. And he argues that the Government should not have highlighted the fact that he lived in a beach town or that he travelled in and out of Costa Rica after withdrawing from the conspiracy. Petitioner further contends the Government should not have disclosed that he admitted he knew about the 2006 raids and arrests; however evidence of this knowledge is clearly relevant to rebut his contention that he would have cooperated with the Government because it shows that he had the means, but not the effort to contact the Government after learning of the raids.

B.     Prosecutorial misconduct

To establish prosecutorial misconduct, Petitioner must demonstrate (1) that the conduct of the United States was in fact improper and (2) that the improper conduct prejudicially affected

Petitioner's substantial rights so as to deprive him of a fair trial. <u>United States v. Mitchell</u>, 1 F.3d 235, 240 (4th Cir. 1993).

    1.   Enticing to proffer sessions (Ground Two) (A)

Petitioner renews his contention that he was "enticed" into participating in the proffer sessions by the Government's promise of a plea offer that was more favorable than the plea agreement he ultimately received. (Petitioner's Mem. 18). This argument renews his attack on the knowing and voluntary nature of his guilty plea. The question of whether anybody (counsel, Government or otherwise) promised, induced or "enticed" him into entering his plea agreement has been resolved against Petitioner. So has the question of whether anybody (counsel, Government or otherwise) made you any promises of leniency or a lighter sentence to induce you to plead guilty: No.

It is established that the guilty plea was knowing and voluntary, therefore any attempt to challenge this fact, yet again, through a claim of prosecutorial misconduct must fail.

    2.   Coercion to sign plea agreement (Ground Two) (B)

For the reasons stated in Ground One (D), <u>supra</u>, the Court finds that this claim is without merit. In other words, this is still another attack on his guilty plea and it will be denied.

    3.   Use of protected proffered statements against Petitioner (Ground Two) (C)

For the reasons stated in Ground One (G), <u>supra</u>, the Court finds that this claim will be denied because the Court has already ruled the Government did not violate the proffer agreement in using statements of Petitioner to rebut claims he made for leniency.

    4.   Use of false statements based on protected proffer statements (Ground Two) (D)

Petitioner blankly contends the Government erred during sentencing by challenging his motion for a variance when it argued that (1) he was hiding in the beach town (where he retreated with the $40,000 that was stolen from victims during the conspiracy); (2) that he knew he was wanted by authorities; (3) and that he was trying to avoid capture by flying to Canada. (Petitioner's Mem. 22). This argument is without merit because his counsel disclosed the "protected" statements that he made during proffer sessions, and he did so in support of a variance, there being so little else to go on. And as noted herein, the statements are fairly offered as rebuttal statements under the terms of the proffer agreement because the statements challenge the validity of his claim that he would have assisted the Government in its prosecution.

5.   Failure to file for sentencing reduction (Ground Two) (E)

As the Court explained before, there is no evidence whatever the Government made any promise to file a motion for departure or variance, and pursuant to USSG § 5K1.1, the Government has the sole discretion in deciding when and if to file a § 5K motion.

C.      District Court errors

Petitioner presents a host of contentions that this Court erred in calculating and fashioning his sentence. First, the sentencing challenges he presents are not properly subject to collateral attack as they should have been presented, if at all, in a direct appeal. Therefore, these claims are procedurally defaulted. See Bousely v. United States, 523 U.S. 614, 621 (1998) (noting that "'[h]abeas review is an extraordinary remedy and "will not be allowed to do service for an appeal.'") (citing Reed v. Farley, 512 U.S. 339, 354 1994) (quoting Sunal v. Large, 332 U.S. 174, 178 (1947)).

A petitioner may, however, avoid procedural default and proceed with certain claims for the first time in a collateral proceeding if (1) he can demonstrate cause for failing to present the

claims on direct review and (2) actual prejudice. <u>Bousley</u>, <u>supra</u>, at 621-22. Plaintiff has plainly failed to carry his burden in this regard; therefore these claims will be dismissed.

In addition, the Fourth Circuit concluded that his challenge to the procedural and substantive reasonableness of his sentence was barred by the appeal waiver in his plea agreement. <u>See</u> <u>Zakrzewski</u>, 462 F. App'x at 427. Accordingly, because this issue has already been decided against Petitioner on appeal, he is foreclosed from renewing it on collateral review. <u>See</u> <u>Boeckenhaupt v. United States</u>, 537 F.2d 1182, 1183 (4th Cir. 1976); <u>see also</u> <u>United States v. Bell,</u> 5 F.3d 64, 66 (4th Cir. 1993) (holding the law of the case doctrine forecloses litigation of issues expressly or impliedly decided by the appellate court) (internal citation omitted).

IV.     CONCLUSION

For the reasons stated herein, Petitioner's Motion to Vacate will be denied and dismissed.

**IT IS, THEREFORE, ORDERED** that Petitioner's Motion to Vacate is **DENIED AND DISMISSED WITH PREJUDICE**. (Doc. No. 1).

**IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 474, 484 (2000) (holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

The Clerk is respectfully directed to close this civil case.

**SO ORDERED**.

Signed: March 14, 2017

Frank D. Whitney
Chief United States District Judge